**Janice M. FALLS, Respondent,**

v.

**COCA COLA ENTERPRISES, INC., and Sedgwick Claims Management Services, Inc., Relators.**

**No. A06–994.**

Supreme Court of Minnesota.

Jan. 18, 2007.

David J. Klaiman, Brad M. Delger, Aafedt, Ford, Gray, Monson & Hager, P.A., Minneapolis, MN, for Relator.

William H. Getts, Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

We review on certiorari a decision of the Workers' Compensation Court of Appeals (WCCA) reversing a workers' compensation judge's determination to discontinue temporary total disability benefits being paid to Janice M. Falls by her self-insured employer, Coca Cola Enterprises, Inc. The workers' compensation judge had found that Falls refused suitable employment and was therefore barred by Minn.Stat. § 176.101, subd. 1(i) (2004), from making any future claims for temporary total disability benefits. We affirm the WCCA.

Respondent Janice M. Falls started working for relator Coca Cola Enterprises, Inc., in 1989. Over the years Falls performed a number of jobs for Coca Cola, including route driving, merchandising, and yard shoveling. In May 2005, she was working 12 to 14 hours a day as a "bulk driver" on a four-day per week night shift. Her job involved delivering beverage cases to retailers, including unloading and "throwing" cases, that is, stacking the cases in retail stores.

On May 10, 2005, Falls sustained an admitted injury to her left elbow while throwing cases. After injuring her elbow, Falls continued to work her normal shift at Coca Cola; but as a result of the injury, she sought medical attention at the Airport Medical Clinic (AMC) on May 18, 2005. An AMC physician diagnosed her injury as lateral epicondylitis. The AMC physician imposed work conditions that restricted her from lifting, carrying, pushing, and pulling items over 15 pounds. When Falls expressed concern to the physician about problems with operating the hand clutch on her motorcycle, which was her only mode of transportation, she was advised that reliable transportation was not "a work comp issue" and that transportation to and from work was her responsibility.

When Falls reported to work at Coca Cola on the evening of May 18, she presented her work restrictions to her supervisor. The supervisor assigned her to light-duty work, initially assisting another route driver with the driver's clerical work. In order to provide this assistance, Falls rode in the passenger seat of the other driver's truck. Although the driver's seat in the truck was an "air-ride" truck seat, the passenger seat was metal and as a result, the bouncing of the truck aggravated Falls' elbow condition. Consequently, on May 19, Falls' supervisor reassigned her to a job counting bottle caps.

Falls was scheduled to be away from work from the morning of May 22 until the beginning of her night shift on May 24, 2005, so she did not work on those days. On her next regularly scheduled work day, May 24, she called in sick due to pain in her left elbow that prevented her from operating the clutch on her motorcycle. She remained on sick-leave status for one week, during which time she had her motorcycle clutch replaced with one that was easier to operate.

On June 1, 2005, Falls saw her family physician at the HealthEast Rice Street Clinic. She told her physician that she

experienced pain and weakness when twisting her lower arm. Her physician commented in her notes that pain and tenderness over the left epicondyle were consistent with lateral epicondylitis. To hasten Falls' recovery, the physician recommended that Falls "remain on relative rest" with the affected arm for two weeks. Falls was then fitted with a tennis-elbow brace and advised to return to her physician's office in two weeks for reexamination. Because of a scheduling problem with her physician, Falls' off-work status continued through June 27, 2005.

Meanwhile, on receipt of Falls' "off-work physician's slip," Coca Cola's claims management service commenced payment of temporary total disability benefits as of June 1, 2005.[1] But, from June 2, 2005 through June 17, 2005, Coca Cola also had a surveillance crew monitor and videotape Falls' activities. This crew videotaped Falls riding her motorcycle to Coca Cola's facility, where she was observed using both arms to load three cases of bottled water into a small trailer attached to her motorcycle and then, after returning to her home, unhitching the trailer and pulling it across her lawn. The surveillance crew also videotaped Falls in her backyard where she was observed sanding and painting wooden window screens. More specifically, she was observed holding a screen with her left arm and sanding with her right arm.

On June 21, 2005, Coca Cola filed a notice of intention to discontinue Falls' wage loss benefits on grounds that, based on its surveillance, she was seen exceeding the "assumed limitations set forth by her doctor." On June 28, Coca Cola discharged Falls from her employment on grounds of "providing fails [sic] information to her supervisor regarding her medi-

cal injury." On July 25, following an administrative conference, Falls' wage loss benefits were discontinued by an interim administrative order.

Falls filed an objection to the discontinuance of wage loss benefits, and the matter was referred for an expedited hearing before a workers' compensation judge. At the hearing, Coca Cola asserted that Minn. Stat. § 176.101, subd. 1(i), precluded Falls from receiving temporary total disability compensation because she refused a suitable work offer. While this assertion differed from the grounds originally asserted by Coca Cola, Falls did not object to this expansion of the issues before the compensation judge.

Evidence presented to the compensation judge included deposition testimony of Falls' family physician who indicated that by July 25, 2005, Falls could have returned to truck driving, but not throwing cases. The physician acknowledged that, at all times following the injury, Falls would have been physically capable of performing light duty work involving only the use of her right arm. Coca Cola presented as evidence the videotape taken by its surveillance crew. Coca Cola also submitted a report from an adverse medical consultant who saw Falls on September 12, 2005. The consultant agreed with the diagnosis of left lateral epicondylitis, thought that Falls might also have ulnar collateral ligament strain or disruption, and recommended an MRI scan "to determine the extent of her pathology." The consultant concluded that Falls could work subject to a 50–pound lifting limitation and, although he reviewed the surveillance videotapes, the consultant did not address Falls' ability to work in June 2005.

---

1. "For injury producing temporary total disability, the compensation is 66–2/3 percent of the weekly wage at the time of injury." Minn.Stat. § 176.101, subd. 1(a) (2004).

The workers' compensation judge found that based on the surveillance videotape of Falls' activity between June 3, 2005 and June 17, 2005, Falls had refused suitable employment and was therefore disqualified from the receipt of temporary total disability benefits by Minn.Stat. § 176.101, subd. 1(i). On appeal, the WCCA reversed, concluding that (1) the statutory disqualification for refusing a work offer did not apply to situations in which the work offer predated the period of total disability, and (2) there was no overt refusal of a work offer and no evidence of a constructive refusal. *Falls v. Coca Cola Enters., Inc.,* No. WC05–274, 2006 WL 1324475, at *1 (Minn. WCCA Apr. 27, 2006). Coca Cola subsequently filed this certiorari appeal under Minn.Stat. § 176.471 (2004).

## I.

■ We will not disturb the findings of a workers' compensation judge that have been affirmed by the WCCA unless the judge's findings are manifestly contrary to the evidence or unless the evidence clearly requires reasonable minds to adopt a contrary conclusion. *Pelowski v. K–Mart Corp.,* 627 N.W.2d 89, 92 (Minn.2001) (citing *Hengemuhle v. Long Prairie Jaycees,* 358 N.W.2d 54, 59 (Minn.1984)). But we review questions of law de novo. *Busch v. Advanced Maint.,* 659 N.W.2d 772, 776 (Minn.2003) (citing *Vezina v. Best Western Inn Maplewood,* 627 N.W.2d 324, 328 (Minn.2001)). Here, Coca Cola asserts that the WCCA erred and that we should defer to the workers' compensation judge's findings because the findings were not contrary to the evidence nor did the evidence clearly require a different conclusion. We disagree because we conclude that this case presents a question of law.

Temporary total disability benefits, which are payable during a period of total disability, are subject to eight "cessation"

and "recommencement" provisions. Minn. Stat. § 176.101, subd. 1(d) (2004). Temporary total disability benefits cease when: (1) the employee returns to work, *id.,* subd. 1(e); (2) when the employee withdraws from the labor market, *id.,* subd. 1(f); (3) when the employee fails to make a diligent search for work, *id.,* subd. 1(g); (4) when the employee has been released to work without restrictions, *id.,* subd. 1(h); (5) when the employee refuses an offer of suitable work, *id.,* subd. 1(i); (6) 90 days after maximum medical improvement, *id.,* subd. 1(j); (7) when 104 weeks of temporary total disability benefits have been paid, *id.,* subd. 1(k); and (8) if there are other grounds under the law to suspend or discontinue these benefits, *id.,* subd. 1(*l*). Coca Cola asserts that subdivision 1(i) mandates the cessation of Falls' benefits. The workers' compensation judge agreed with Coca Cola when it determined that Falls' temporary total disability benefits were subject to discontinuance under subdivision 1(i) because Falls refused an offer of suitable work.

When reversing the workers' compensation judge, the WCCA adhered to the rule that the provisions of the Workers' Compensation Act must be considered in light of related provisions. *Zurich Am. Ins. Co. v. Bjelland,* 710 N.W.2d 64, 68 (Minn. 2006). It cited Minn.Stat. § 176.101, subd. 1(d), which states that temporary total disability benefits are "subject to the cessation and recommencement conditions in paragraphs (e) to (*l*)." *Falls,* 2006 WL 1324475, at *4. The WCCA then concluded that because a refusal of suitable employment under Minn.Stat. § 176.101, subd. 1(i), is one of the cessation conditions set out in subdivision 1(d), application of subd. 1(i) encompasses only those situations in which the employee's entitlement to temporary total benefits commenced before the employment offer. *Falls,* 2006 WL 1324475, at *4. It cited *Oliver v. Axman*

*Surplus,* 1999 WL 1242854, at *4 (Minn. WCCA Dec. 1, 1999), which notes that "[c]learly, benefits which never commenced cannot cease." *Falls,* 2006 WL 1324475, at *4. Stated another way, to ground a discontinuance of temporary total disability benefits on a refusal of suitable employment, "there must be a job offer after the commencement of temporary total benefits." *Id.* (citing *Dell v. Parker Hannifin,* No. WC04–128, 2004 WL 1697810, at *4 (Minn. WCCA July 12, 2004)). Because the WCCA concluded that there was no job offer made to Falls after the commencement of temporary total disability benefits, it held that "[o]n this point alone, the decision of the compensation judge is reversible." *Id.*

On appeal, Coca Cola relies on contract law principles to support its argument that, by offering Falls suitable light-duty work before the period of her total disability, it had offered Falls a position within her restrictions, and therefore Minn.Stat. § 176.101, subds. 1(d) and (i), require that her benefits cease. We have said that: "Strictly speaking, the rights and liabilities created by the Workers' Compensation Act are imposed on the employment relationship pursuant to the police power, independently of any actual or implied contract." *Joyce v. Lewis Bolt & Nut Co.,* 412 N.W.2d 304, 307 (Minn.1987) (citing *Todeva v. Oliver Iron Mining Co.,* 232 Minn. 422, 428, 45 N.W.2d 782, 788 (1951)). Nevertheless, on the theory that the Act becomes a part of the contract of employment, we have treated the Act as being "contractual in nature" and have stated that "any statute which purports to alter a substantial term of the contract which was in effect at the time the controlling event occurred" has been held to "impair[ ] the obligation of such contract" and is therefore unconstitutional. *Joyce,* 412 N.W.2d at 307 (internal quotation marks omitted).

But, contrary to Coca Cola's argument, the basic principles related to payment of wage-loss benefits are not grounded on contract law. Instead, "[l]iability on the part of an employer or the insurer for disability of a temporary total, temporary partial, and permanent total nature shall be considered as a continuing product and part of the employee's inability to earn or reduction in earning capacity due to injury or occupational disease." Minn.Stat. § 176.021, subd. 3 (2004). Wage-loss benefits are intended to replace a portion of the employee's income that is lost as a result of the compensable disability. 1 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 1.03[5] (2006).

Compensable disability is generally viewed as the "inability, as the result of a work-connected injury, to perform or obtain" suitable work. 4 Larson & Larson, *supra,* at 80–1; *see Schulte v. C.H. Peterson Constr. Co.,* 278 Minn. 79, 83, 153 N.W.2d 130, 133–34 (1967) (stating the rule that "a person is totally disabled if his physical condition, in combination with his age, training, and experience, and the type of work available in his community, causes him to be unable to secure anything more than sporadic employment resulting in an insubstantial income."). Accordingly, if a claim for benefits depends on a factual showing of an inability to work due to the work injury, "the employer may defend [against such a claim] on the ground that claimant has refused suitable work." 4 Larson & Larson, *supra,* § 85.01; *see Morrison v. Merrick's Super Mkt., Inc.,* 300 Minn. 535, 536–37, 220 N.W.2d 344, 345 (1974) (affirming denial of wage-loss benefits for refusal of available work).

Moreover, Minn.Stat. § 176.101,

subd. 1(i),[2] provides that: "[o]nce temporary total disability compensation has ceased under this paragraph, it may not be recommenced." Consequently, under the statute, an employee who refuses suitable work forfeits temporary total disability benefits for any and all future periods of temporary total disability that are caused by the same injury.

Workers' compensation is a purely legislative creation, but we have stated that " '[b]asic fairness requires that the parties in a workers' compensation proceeding be afforded reasonable notice and an opportunity to be heard before decisions concerning entitlement to benefits can be made.' " *Manderfeld v. J.C. Penney,* 526 N.W.2d 52, 54 (Minn.1995) (citation omitted). In *Manderfeld,* an injured worker rejected an offer of work. *Id.* at 53. A subsequent claim for rehabilitation expenses was denied on the ground that under the two-tier compensation system then in place, rehabilitation was forfeited by the employee's prior rejection of an offer of work. *Id.* We reversed the WCCA, concluding that basic fairness required that a worker have reasonable notice and an opportunity to be heard before benefits were deemed forfeited. *Id.* at 54.

■■■ Under the current system, the forfeiture for refusing an offer of work might not be as significant as the forfeiture under the two-tier system we reviewed in *Manderfeld;* but for some injured workers, like Falls—who received three weeks out of the statutory maximum of 104 weeks of benefits—the forfeiture could have considerable financial impact.

We conclude that the WCCA's reading of the current statutory scheme—that conditions the discontinuance of temporary total disability benefits on an actual offer of suitable work during the payment of those benefits—properly addresses the same "basic fairness" concerns we noted in *Manderfeld.* We therefore conclude that the cessation condition in Minn.Stat. § 176.101, subd. 1(i), under which temporary total disability benefits cease if the employee refuses an offer of suitable work, does not apply to work offers made before the commencement of temporary total disability benefits. Because Coca Cola made its job offer to Falls in May 2005 before the commencement of her temporary total disability benefits on June 1, 2005, we hold that the workers' compensation judge erred in terminating Falls' benefits and therefore the WCCA's decision reversing the compensation judge on this issue should be affirmed.

II.

Coca Cola also argues that Falls' conduct amounted to a constructive refusal of a work offer. The WCCA has concluded that a "constructive refusal may be inferred from an unjustifiable and intentional failure to respond to a job offer within a reasonable time or from misconduct by the employee after the return to work which justifies the employee's termination." *Falls,* 2006 WL 1324475, at *4 (citations omitted). Here, the WCCA declined "to expand the scope of constructive refusal beyond [its own] case law and hold that an employee who engages in activities beyond the restrictions set by the treating doctor

---

**2.** Minnesota Statutes § 176.101, subd. 1(i), provides:

> Temporary total disability compensation shall cease if the employee refuses an offer of work that is consistent with a plan of rehabilitation filed with the commissioner which meets the requirements of section 176.102, subdivision 4, or, if no plan has been filed, the employee refuses an offer of gainful employment that the employee can do in the employee's physical condition. Once temporary total disability compensation has ceased under this paragraph, it may not be recommenced.

is refusing employment and is precluded from temporary total disability benefits." *Id.* Accordingly, the WCCA concluded that Falls' conduct did not constitute a constructive refusal of suitable employment. *Id.* at \*5. We agree with this conclusion.

Affirmed.

Employee is awarded $1,200 in attorney fees.